# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRALEN LAMAR JORDAN,

        Plaintiff,

    v.

DAVID J. EBBERT, *et al.*,

        Defendants.

No. 4:19-CV-00997

(Judge Brann)

## MEMORANDUM OPINION

### SEPTEMBER 10, 2020

Plaintiff Bralen Lamar Jordan, a prisoner presently confined at the United States Penitentiary in Thomson, Illinois, filed a complaint pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*[1] against Defendants asserting Eighth Amendment excessive force and medical claims arising from a period of time during which he was held in four point restraints at the United States Penitentiary at Lewisburg, in Lewisburg, Pennsylvania.[2]  Presently before the Court is Defendants' motion to dismiss, or in the alternative, for summary judgment, which is ripe for adjudication.[3]  For the reasons that follow, the Court will grant the motion for summary judgment.

---

[1]  403 U.S. 388 (1971).
[2]  Doc. 1.
[3]  Docs. 28 (motion), 31 (opposition to motion).

## I.    FACTUAL BACKGROUND

On April 16, 2018, Plaintiff was transferred to the Special Management Unit ("SMU") at the United States Penitentiary in Lewisburg, Pennsylvania, where he was confined at all times relevant to the complaint.[4]  Designation to the non-punitive SMU program is for inmates who require greater management of their interactions to ensure the safety, security, and orderly operation of Bureau of Prison ("BOP") facilities.[5]  The conditions in the SMU are more restrictive than in general population.[6]  Inmates designated to the SMU program are expected to advance through the program and later return to the appropriate general population facility.[7]

On May 24, 2018, at approximately 10:49 a.m., Plaintiff became disruptive in G-Block, cell 222, displaying signs of imminent violence and therefore causing staff to call for assistance.[8]  Plaintiff was being placed back into his assigned cell after a random cell search, and when staff removed his hand restraints he threatened staff.[9]  During the random cell search, staff had found and confiscated a sharpened metal weapon in the cell.[10]  Plaintiff again displayed signs of imminent violence and

---

[4]   Doc. 29 at 2.
[5]   *Id.*
[6]   *Id.*
[7]   *Id.*
[8]   *Id.*
[9]   *Id.* at 3.
[10]  *Id.*

threatened staff by stating that he had another weapon and that he would disembowel the staff.[11]

Due to Plaintiff's display of imminent violence and the threatening of staff, the warden authorized the use of force team to remove Plaintiff from his cell and place him in four point restraints.[12]  Plaintiff has a history of defeating restraints; therefore, the warden specifically authorized the use of four-point restraints.[13]

At approximately 12:07 p.m. on May 24, Plaintiff was removed from his cell and escorted to J-Block, cell 327, where he was visually searched, metal detected, and dressed in alternate clothing.[14]  At approximately 12:31 p.m., Plaintiff was placed in four-point restraints, photographed, and medically assessed with no injuries noted.[15]  Defendant Lieutenant M. Saylor was the lieutenant for the use of force team that placed Plaintiff in four point restraints.[16]  The lieutenant and medical staff determined that the restraints were applied properly.[17]  Lieutenant Saylor denies that the restraints were applied inappropriately or too tightly.[18]

---

[11]  *Id.* at 3.
[12]  *Id.*
[13]  *Id.*
[14]  *Id.*
[15]  *Id.*
[16]  *Id.* at 4.
[17]  *Id.*
[18]  *Id.*  Lieutenant Saylor had no further involvement with Plaintiff during the time Plaintiff remained in four-point restraints.  *Id.*

3

Plaintiff's restraints were removed at 10:00 a.m. on May 25, 2018, when staff determined that he had regained self-control.[19]   An "After Action Review" was conducted and it was determined that the use of force and application of restraints were reasonable and appropriate.[20]

BOP policy authorizes staff "to apply physical restraints necessary to gain control of an inmate who appears to be dangerous because the inmate: (a) Assaults another individual; (b) Destroys government property; (c) Attempts suicide; (d) Inflicts injury upon self; or (e) Becomes violent or displays signs of imminent violence."[21]   BOP policy provides that "[r]estraints should remain on the inmate until self-control is regained."[22]   "Restraint equipment or devices (e.g. handcuffs) may not be used . . . [i]n a manner that causes unnecessary physical pain or extreme discomfort."[23]   "In general, when applying restraints, staff will use sound correctional judgment to ensure unnecessary pressure is not applied to the inmate."[24] BOP policy directs that for inmates in four-point restraints, "[s]taff shall check the inmate at least every 15 minutes, both to ensure that the restraints are not hampering circulation and for the general welfare of the inmate"  and that "[a] review of the inmate's placement in four-point restraints shall be made by a Lieutenant every two

---

[19]   *Id.*
[20]   *Id.* at 5.
[21]   *Id.* at 5-6.
[22]   *Id.* at 6.
[23]   *Id.*
[24]   *Id.*

hours to determine if the use of restraints has had the required calming effect and so that the inmate may be released from these restraints (completely or to lesser restraints) as soon as possible."[25]

In addition, "[w]hen the inmate is placed in four-point restraints, qualified health personnel shall initially assess the inmate to ensure appropriate breathing and response (physical or verbal)" and "shall also ensure that the restraints have not restricted or impaired the inmate's circulation."[26]  "When inmates are so restrained, qualified health personnel ordinarily are to visit the inmate at least twice during each eight hour shift."[27]  "Use of four-point restraints beyond eight hours requires the supervision of qualified health personnel.[28]  Mental health and qualified health personnel may be asked for advice regarding the appropriate time for removal of the restraints."[29]

In Plaintiff's case, records reveal that fifteen minute restraint checks were completed in accordance with policy from 12:31 p.m. on May 24, 2018 until 10:00 a.m. on May 25, 2018.[30]  None of the named Defendants conducted the fifteen-minute checks.[31]  Plaintiff's records also reveal that two-hour lieutenant checks were

---

[25] *Id.* at 6-7.
[26] *Id.* at 7.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*

completed in accordance with policy during that time.[32]   Defendant Lieutenant Troutman performed Plaintiff's restraint checks for the 2:00 p.m., 6:00 p.m., and 8:00 p.m. times on May 24, 2018[33]   Plaintiff maintained a poor attitude and used profanity during each of Lieutenant Troutman's restraint checks on May 24, 2018.[34] In Plaintiff's case, records reveal that Plaintiff was routinely checked by medical and psychology staff pursuant to policy, and that the records reflect that Plaintiff's restrains were properly fitted.[35]

Health Services staff conducted a medical assessment following the application of restraints and noted no signs of trauma, Plaintiff had good pulses, and no complaints.[36]   While he was in restraints, Plaintiff was closely monitored by correctional staff, Health Services, and Psychology in accordance with BOP policy.[37]   After the initial assessment, Plaintiff was assessed by Health Services five times while he was in restraints.[38]

During the 4:00 p.m. restraint check on May 24, 2018, conducted by Health Services staff, Plaintiff refused food, water, and use of the toilet; he was educated on restraint manipulation; his circulation and vital signs were good; and he voiced

---

[32]  *Id.* at 8.
[33]  *Id.*
[34]  *Id.*
[35]  *Id.*
[36]  *Id.* at 9.
[37]  *Id.*
[38]  *Id.*

no complaints.[39]  During the 6:00 p.m. restraint check on May 24, 2018, conducted by Health Services, Plaintiff requested that his left shoulder be assessed.[40]  The exam yielded no trauma or deformity, and Health Services staff advised Plaintiff about the dangers of manipulating restraints.[41]  During the restraint check at 12:00 a.m. on May 25, 2018, Plaintiff again complained of shoulder pain at a 2 on a 1-10 pain scale.[42]  Staff noted that Plaintiff was observed repeatedly manipulating the restraints.[43]  Plaintiff was advised to avoid manipulation of the restraints and that his shoulder pain was likely the result of him continually twisting and pulling on the restraints.[44]  The examination showed no trauma, swelling, or deformity of the shoulder, and Plaintiff experienced no decreased sensation, numbness, or tingling.[45]

During the restraint check conducted by Defendant Jessie Ayers at 6:01 a.m. on May 25, 2018, Plaintiff again complained of pain in his shoulders.[46]  The examination showed no injuries, and Defendant Ayers advised Plaintiff to stop manipulating the restraints, just as other staff had previously advised.[47]  Defendant Ayers noted that there were no visible signs of injuries, circulation was adequate,

---

[39]  *Id.*
[40]  *Id.*
[41]  *Id.*
[42]  *Id.* at 10.
[43]  *Id.*
[44]  *Id.*
[45]  *Id.*
[46]  *Id.*
[47]  *Id.*

and the restraints were applied properly.[48]  During the final medical restraint check at 8:00 a.m. on May 25, 2018, Plaintiff made no complaints, and his circulation and vital signs were good.[49]

At each medical check, the restraints moved freely and did not compromise Plaintiff's airway, breathing, or circulation.[50]  At no time were the restraints required to be adjusted due to swelling, injury, or improper placement.  Plaintiff's only complaint during the time period he was in restraints was shoulder pain.[51]  Plaintiff was removed from restraints at 10:00 a.m. on May 25, 2018 after he had exhibited a pattern of compliance.[52]  When Psychology Services assessed Plaintiff on May 25, 2018, Plaintiff  stated that he was alright and did not need anything from Psychology at that time.[53]

On May 26, 2018, during pill line, Plaintiff complained to Health Services that he was experiencing a dull aching pain in his shoulders.[54]  Staff noted that Plaintiff had full range of motion in both shoulders and he displayed no outward sign of pain.[55]  Plaintiff was issued a three day course of ibuprofen and provided range of motion exercises.[56]

---

[48]  *Id.* at 11.
[49]  *Id.*
[50]  *Id.*
[51]  *Id.*
[52]  *Id.*
[53]  *Id.*  at 12.
[54]  *Id.*
[55]  *Id.*
[56]  *Id.*

Plaintiff next complained of shoulder pain on July 18, 2018.[57]  He told staff that he had tried aspirin and range of motion exercises but there was no improvement with the pain.[58]  He reported that his shoulder pain was a 7 on a 1-10 pain scale.[59]  He was given a thirty day course of ibuprofen, advised to avoid upper body workouts, and to continue doing his range of motion exercises.[60]

On September 10, 2018, Plaintiff again complained of left shoulder pain and discomfort at a 7 on a 1-10 pain scale.[61]  Upon examination, Plaintiff showed tenderness and decreased range of motion in his left shoulder.[62]  Staff ordered an x-ray of his left shoulder and referred him to orthopedics.[63]  The x-ray was completed on September 14, 2018, and showed no abnormalities.[64]

Plaintiff had an orthopedic consultation on October 3, 2018.  Plaintiff's rotator cuff strength was 5/5 with acromioclavicular joint tenderness and good sensation in his left hand.[65]  Plaintiff was diagnosed with rotator cuff tendonitis in his left shoulder.[66]  The orthopedic doctor recommended a prednisone injection in his left

---

[57]  *Id.*
[58]  *Id.*
[59]  *Id.* at 13.
[60]  *Id.*
[61]  *Id.*
[62]  *Id.*
[63]  *Id.*
[64]  *Id.*
[65]  *Id.*
[66]  *Id.*

shoulder, a prescription for the anti-inflammatory Mobic (meloxicam), and to recheck as needed.[67]  The recommended medications were ordered.[68]

On October 26, 2018, non-party Dr. Pigos evaluated Plaintiff at a chronic care appointment during which Plaintiff made no mention of shoulder pain.[69]

Plaintiff was placed in four-point restraints again on January 19, 2019, through January 20, 2019, during which time he never complained of shoulder pain.[70]  A few months later, on March 4, 2019, Dr. Pigos again evaluated Plaintiff at a chronic care appointment during which Plaintiff did not complain of shoulder pain.[71]  On April 2, 2019, Plaintiff reported to Health Services staff that he was experiencing numbness in his right hand and fingers since January 2019, when he was placed in restraints.[72]  Examination showed that Plaintiff had full range of motion in his fingers, but decreased sensation to light touch.[73]  Plaintiff was prescribed an eighteen day course of prednisone.

On May 7, 2019, Health Services staff noted in Plaintiff's chart that he complained of bilateral shoulder pain and requested staff to order x-rays of his shoulders and back.[74]  A review of his chart reflected that there were no recent

---

[67]  *Id.*
[68]  *Id.* at 14.
[69]  *Id.*
[70]  *Id.*
[71]  *Id.*
[72]  *Id.*
[73]  *Id.*
[74]  *Id.* at 14-15.

injuries or complaints of shoulder pain, and that he was already prescribed meloxicam.[75]   Medical staff advised Plaintiff to continue taking the meloxicam, avoid high impact exercises, and continue his range of motion exercises.[76]

On June 10, 2019, Health Services staff again noted in Plaintiff's chart that he continued to complain of bilateral shoulder pain.[77]   Staff ordered x-rays and referred him to orthopedics for further evaluation.[78]   The x-ray on June 14, 2019, showed no abnormalities.[79]   The x-ray did show minimal distal clavicle osteolysis.[80]   Minimal distal clavicle osteolysis is a condition commonly seen in athletes and/or weightlifters who perform heavy lifting over a long period of time.[81]   Treatment for minimal distal clavicle osteolysis includes rest, icing, anti-inflammatory medication, and physical therapy.[82]

Plaintiff was treated in the orthopedic clinic on July 3, 2019.[83]   Plaintiff was diagnosed with rotator cuff tendonitis in both left and right shoulders.[84]   Plaintiff was advised to continue taking meloxicam, and he received a prednisone injection in each shoulder.[85]   A review of Plaintiff's clinical encounters reveal that he has been

---

[75]   *Id.* at 15.
[76]   *Id.*
[77]   *Id.*
[78]   *Id.*
[79]   *Id.*
[80]   *Id.*
[81]   *Id.*
[82]   *Id.*
[83]   *Id.*
[84]   *Id.* at 16.
[85]   *Id.*

seen by Health Services numerous times for other medical complaints, in addition to his complaints of shoulder pain.[86]

The BOP has a computerized SENTRY database through which formal administrative remedies are tracked.[87]  Each administrative remedy is given an identification number upon submission, and each number is then followed by a letter representing the level that particular remedy was filed at, and a number to indicate how many times that remedy was filed at each particular level.[88]  The institutional administrative remedies are identified by the letter "F", the letter "R" is used for the regional office, and the BOP's Central Office is represented by the letter "A."[89]  An administrative remedy is not considered to be exhausted until it is denied by the Central Office.[90]

Plaintiff has filed a total of 172 administrative remedies while incarcerated by the BOP.[91]  Of the 172 administrative remedies that Plaintiff filed, 76 were filed between the date Plaintiff arrived at USP Lewisburg on April 16, 2018, and June 21, 2019, when Plaintiff initiated this lawsuit.[92]  Of those 76 administrative remedies, Plaintiff has only exhausted 10 of them.[93]  Of the 10 administrative remedies which

---

[86] *Id.*
[87] *Id.*
[88] *Id.* at 17.
[89] *Id.*
[90] *Id.*
[91] *Id.*
[92] *Id.*
[93] *Id.*

Plaintiff successfully exhausted, only 2 of them concerned issues related to Plaintiff's instant lawsuit - Remedy No. 952661 and Remedy No. 960665.[94] Plaintiff filed Remedy No. 952661 concerning allegations that Health Services staff failed to treat his shoulder pain;[95] Plaintiff filed Remedy No. 960665 concerning treatment for his chronic conditions in general, but makes no mention of shoulder pain.[96] No other administrative remedies pertaining to the instant complaint have been exhausted.[97]

## II.    Standard of Review

Summary judgment should be granted when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law.[98]  A disputed fact is material when it could affect the outcome of the suit under the governing substantive law.[99]  A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[100]  The Court should view the facts in the light most favorable to the non-

---

[94]  *Id.* at 18.
[95]  *Id.*
[96]  *Id.*
[97]  *Id.*  On June 7, 2018, Plaintiff filed Remedy No. 943308-R1 with the Northeast Regional Office alleging a staff complaint for a cell search occurring on May 24, 2018, however this grievance is unexhausted and includes no allegations regarding Plaintiff's placement in four point restraints.  *Id.* at 18-19.
[98]  Fed. R. Civ. P. 56(c).
[99]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[100]  *Id.* at 250.

moving party and make all reasonable inferences in that party's favor.[101]  When the non-moving party fails to refute or oppose a fact, it may be deemed admitted.[102]

Initially, the moving party must show the absence of a genuine issue concerning any material fact.[103]  Once the moving party has satisfied its burden, the non-moving party, "must present affirmative evidence in order to defeat a properly supported motion for summary judgment."[104]  "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla."[105]  "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c)," a court may grant summary judgment or consider the fact undisputed for purposes of the motion.[106]

If the court determines that "the record taken as a whole could not lead a rational trier or fact to find for the non-moving party, there is no 'genuine issue for trial.'"[107]  Rule 56 mandates the entry of summary judgment against the party who

---

[101]  *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).
[102]  *See* Fed. R. Civ. P. 56(e)(2); Local R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.").
[103]  *See Celotex Corp. v. Carrett*, 477 U.S. 317, 323 (1986).
[104]  *Anderson*, 477 U.S. at 257.
[105]  *Hugh*, 418 F.3d at 267 (citing *Anderson*, 477 U.S. at 251).
[106]  Fed. R. Civ. P. 56(e)(2)-(3).
[107]  *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.[108]

In this matter, Plaintiff has failed to oppose or refute the facts asserted in Defendants' statement of facts.[109]  Pursuant to Federal Rule of Civil Procedure 56(e),[110] the Court has reviewed the facts contained in the statement of facts as well as each fact's citation to the record and will consider each fact undisputed.[111]  A thorough and comprehensive review of the record makes clear that no material fact is in dispute as to the dispositive issue in this case.  As such, summary judgment is appropriate here.[112]

## III.   DISCUSSION

Defendants argue, *inter alia*, that Plaintiff has failed to exhaust his administrative remedies, which bars his Eighth Amendment excessive force claim, and that he has failed to demonstrate he suffered any deliberate indifference as to his medical care claim.  A review of the record demonstrates that although Plaintiff exhausted his grievance as to the medical care he received for shoulder pain, he

---

[108]  *Celotex Corp.*, 477 U.S. at 322.

[109]  See Doc. 31.  Plaintiff filed a document replying to the motion to dismiss and/or for summary

[110]  *See* Fed. R. Civ. P. 56(e)(1).

[111]  *See* Fed. R. Civ. P. 56(e)(2).

[112]  *See* Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it.").

failed to file or exhaust any grievance related to the alleged excessive force of being held in four point restraints.

### A.   Eighth Amendment Excessive Force Claim

Section 1997e(a) provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Exhaustion, as a precondition for bringing suit, is a "'threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time.'"[113]  "[T]he . . . exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."[114]  A prisoner must exhaust all available administrative remedies even where the relief sought, such as monetary damages, cannot be granted through the administrative process, as long as the grievance tribunal has authority to take some responsive action.[115]

The applicable procedural rules for properly exhausting administrative remedies "are defined not by [§ 1997e(a)], but by the prison grievance process itself. Compliance with prison grievance procedures, therefore, is all that is required by [§

---

[113]  *Small v. Camden County*, 728 F.3d 265, 270 (3d Cir. 2013).
[114]  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).
[115]  *Booth*, 532 U.S. at 741.

1997e(a)] to 'properly exhaust.'"[116]  The burden of proving non-exhaustion lies with the defendants asserting the defense.[117]  A court evaluating the "threshold" issue of exhaustion looks at whether the inmate "compli[ed] with the prison's specific grievance procedures" and whether those procedures were available to the inmate.[118]

The BOP's Administrative Remedy Program is a multi-tier process that allows "an inmate to seek formal review of an issue relating to any aspect of his/her own confinement."[119]  The inmate first must attempt to informally resolve his issue with the institutional staff.[120]  If informal resolution fails or is waived, the inmate then may submit a formal Administrative Remedy Request on the appropriate BP–9 form within twenty calendar days following the date for which the basis for the request occurred.[121]  If the inmate is unsatisfied with the warden's response to his Administrative Remedy Request, he may submit an appeal on the BP–10 form to the appropriate Regional Director within twenty calendar days of the date the warden signed the response.[122]  An inmate who is not satisfied with the Regional Director's response may appeal to the General Counsel on the appropriate BP–11 form within

---

[116] *Jones v. Bock*, 549 U.S. 199, 218 (2007).  *See Drippe v. Tobelinski*, 604 F.3d 778, 781 (3d Cir. 2010) ("[W]hether a prisoner properly exhausted a claim is made by evaluating compliance with the prison's specific grievance procedures.").

[117] *Jones*, 549 U.S. at 212, 216–17.

[118] *Rinaldi v United States*, 904 F.3d 257, 265 (3d Cir. 2018) (quoting *Drippe*, 604 F.3d at 781, and *Small*, 728 F.3d at 269-71).

[119] 28 C.F.R. § 542.10.

[120] *See id.* § 542.13(a).

[121] *See id.* § 542.14(a).

[122] *See id.* § 542.15(a).

thirty calendar days of the date the Regional Director signed the response.[123]   An inmate's appeal to the General Counsel is the final administrative appeal.[124]   Thus, to satisfy the PLRA's exhaustion requirement, a federal inmate must complete each step of the BOP's administrative remedy process, which is not considered complete until an inmate's final appeal is considered by the Central Office.[125]

In Defendants' statement of facts, which Plaintiff does not dispute, it is clear that while he was incarcerated at USP Lewisburg, Plaintiff failed to exhaust his excessive force claim.  This does not end the Court's inquiry, however, as I must also consider whether the applicable administrative remedies were "available" to Plaintiff for his unexhausted claim.

In *Ross v. Blake*,[126] the Supreme Court of the United States outlined the three instances in which remedies would not be "available" such that exhaustion may be excused: (1) when an administrative procedure "operates as a simple dead end with officers unable or consistently unwilling to provide relief to aggrieved inmates;" (2) where the administrative remedies are so unclear that "no ordinary prisoner can make sense of what it demands;" and (3) where prison officials "thwart inmates from

---

[123]   *See id.*
[124]   *See id.*
[125]   *See* 28 C.F.R. §§ 542.14-542.15; *Rinaldi*, 904 F.3d at 265; *Schreane v. Marr*, 722 F. App'x 160, 164 (3d Cir. 2018).
[126]   136 S. Ct. 1850 (2016).

taking advantage of a grievance process through machination, misrepresentation, or intimidation."[127]

Plaintiff makes no argument that he falls under one of these three categories, nor would they appear to apply to the undisputed facts presented in the motion. First, there is no evidence that the administrative remedy procedure at USP Lewisburg operates as a dead end. Plaintiff has utilized the process many times before. Second, the administrative remedy procedure is not so unclear as to be unavailable, because Plaintiff has utilized it before, and, in this instance, he utilized it correctly as to his Eighth Amendment medical claim. The directions in the BOP's Administrative Remedy Program appear to be clear and easy to read and follow. Finally, there are simply no facts to suggest that prison officials seek to thwart the use of the grievance system at USP Lewisburg.

"[O]nce the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to him."[128] Plaintiff has failed to establish that such remedies were unavailable to him. Accordingly, this Court finds that as a matter of law, Plaintiff failed to exhaust the administrative remedies that were available to him, as he is required to do by § 1997e(a) prior to filing suit as to the Eighth Amendment

---

[127] *Id.* at 1859-60. *See also Rinaldi*, 904 F.3d at 266-67.
[128] *Rinaldi*, 904 F.3d at 268.

excessive force claim.  I will grant Defendants' motion for summary judgment as to that issue.

### B.    Eighth Amendment Medical Claim

Turning to Plaintiff's exhausted Eighth Amendment medical care claim regarding shoulder pain, "[i]n order to state a cognizable [medical] claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment."[129]  "[T]o succeed under these principles, plaintiffs must demonstrate (1) that the defendants were deliberately indifferent to their medical needs and (2) that those needs were serious."[130]  This standard affords considerable latitude for medical professionals within a prison to diagnose and treat the medical problems of inmate patients.[131] Some of the more common situations in which "deliberate indifference" has been found include when the defendant knows of a prisoner's need for medical treatment but intentionally refuses to provide it, delays necessary medical treatment based on a non-medical reason, and prevents a prisoner from receiving needed or recommended medical treatment.[132]

---

[129]  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

[130]  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

[131]  *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979); *Little v. Lycoming County*, 912 F. Supp. 809, 815 (M.D. Pa. 1996).

[132]  *Id.*

In this matter, Plaintiff admits that he received treatment for his shoulder pain. A review of the record demonstrates comprehensive care for Plaintiff while in the restraints and for his shoulder pain, including continued assessment and monitoring while he was in the four point restraints, examination and administration of anti-inflammatories after he was released and complained of shoulder pain, numerous examinations including with an orthopedic doctor, x-rays, and a continued course of treatment that included anti-inflammatories, movement exercises, and cortisone injections.

All of these actions constitute a continued pattern of treatment for Plaintiff's medical condition. It is unclear what further or additional treatment Plaintiff would have preferred; however the mere disagreement with a treatment plan established by medical providers does not rise to the level of a constitutional violation. As the United States Court of Appeals for the Third Circuit has held, "mere disagreement as to the proper medical treatment" does not create an Eighth Amendment medical claim.[133]  Put another way, when an inmate is provided with medical care and the dispute is over the adequacy of that care, an Eighth Amendment claim does not

---

[133] *See Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).

exist.[134]  Notably, medical negligence and malpractice are also insufficient to state an Eighth Amendment claim.[135]

There is simply no evidence presented that the Defendants intentionally refused to provide medical treatment, delayed treatment based on a non-medical reason, or prevented Plaintiff from receiving medical treatment.  The evidence is to the contrary.  Plaintiff has received continued, comprehensive care for his complaints of shoulder pain.  As such, the Court will grant the motion for summary judgment as to Plaintiff's Eighth Amendment medical claim, as well.

## IV.   CONCLUSION

Based on the foregoing, the Court will grant the motion for summary judgment as to both of Plaintiff's Eighth Amendment claims.  An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
United States District Judge

---

[134]  *Nottingham v. Peoria*, 709 F. Supp. 542, 547 (M.D. Pa. 1988).
[135]  *See White v. Napoleon*, 897 F.2d 103, 108-10 (3d Cir. 1990) (citing *Estelle v. Gamble*, 429 U.S. 97, 106).

22